UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case No. 1:20-mj-00007 (DAR) |
| WES OSMAN, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States respectfully submits this Memorandum in support of its motion for pretrial detention pursuant to 18 U.S. C. § 3142(f)(2)(A).

**BACKGROUND**

Due to construction along the north fence line of the White House and its surrounding grounds, the roadway of the 1600 block of Pennsylvania Avenue in Northwest Washington, D.C. is currently closed to public access. There are bicycle rack style security barriers in the roadway on the north side of Pennsylvania Avenue to prevent individuals who are on the north sidewalk of Pennsylvania Avenue from entering into the restricted area of the roadway. The security barriers have signage stating "Restricted Area Do Not Enter".

On Sunday, January 12, 2020, United States Secret Service (USSS) Uniformed Division (UD) Officer Ryan Banville was in full police uniform and was assigned to a foot patrol in the 1600 block of Pennsylvania Avenue. At approximately 1408 hours, Officer Banville observed an individual who was standing on the north sidewalk of Pennsylvania Avenue hop over the security barrier and into the restricted area of the 1600 block of Pennsylvania Avenue. Upon landing in the restricted area, the individual just stood there. The individual was later identified by the USSS as the defendant, Wes Osman, from his driver's license. The defendant did not

have lawful authority to enter or remain in the restricted area on the 1600 block of Pennsylvania Avenue, N.W., Washington, D.C.,

Upon seeing the defendant hop over the fence, Officer Banville approached the defendant, saying "Yo, what are you doing?" and "Don't move!". The defendant remained still. When Officer Banville reached the defendant, the defendant volunteered that he "wanted to talk to POTUS [the President of the United States]". Officer Banville then instructed the defendant to turn around and remove his backpack (which he did), and then placed him in handcuffs. As Officer Banville placed the defendant in handcuffs, Officer Banville advised the defendant that he was being detained. The defendant was subsequently placed under arrest by USSS Officer Jacob Riedel. A search of the defendant revealed paperwork from Expedia indicating that the defendant had purchased an airline to Gaya, India for January 12, 2020, as well as his U.S. Passport. When asked why he jumped the fence, the defendant stated that he had time sensitive information to deliver to the President of the United States. The defendant also advised USSS personnel that his Army supervisor was Captain De Rosa.

After being transported to the Metropolitan Police Department's (MPD) Second District for processing, the defendant was advised of his Miranda rights and agreed to waive them and speak with USSS protective intelligence personnel, Special Agent (SA) Patrick Gallop and Officer Hector Reyes-Arroyo.

The defendant advised that he is a Second Lieutenant in the United States Army and is currently stationed at Fort Benning, Georgia. The defendant explained that he was absent without leave (AWOL) from the Army, and had taken a flight from Columbus, Ohio to La Guardia Airport in New York. The defendant also indicated that he went to visit his family in Brooklyn, New York on Friday, January 10, 2020. The defendant further advised that he had

planned a trip to Gaya, India to save children that are being sexually trafficked and sexually abused. The trip was supposed to depart that [Sunday] morning, but the defendant advised that he could not make it through the security checkpoints inside the airport. When asked why he could not make it through the security checkpoints, the defendant responded that he did not have any idea. The defendant then explained that because of that setback, the defendant decided to take a taxi cab from La Guardia, New York airport to Washington D.C.

During the interview, the defendant also stated that he jumped the bike racks on the north fence line because he needed to speak with the President about the "true answer to the universe" and that it was a very time sensitive subject of human trafficking. The defendant stated that the proper channels were too slow and that nothing was being done about it.

The defendant also advised SA Gallop and Officer Reyes-Arroyo that he has been diagnosed with bipolar disorder by a physician at Fort Benning. The defendant said he was prescribed medication, but advised that he does not comply with it because he believes that the only way to see and reach the true to the center of the universe is without his medication. The defendant also stated that he has been treating his bipolar disorder by overdosing with Zoloft and Klonopin. Zoloft is an anti-depressant. Klonopin is an anti-anxiety medication. The defendant further stated that he also uses marijuana, but that he had not used it in a couple months.

When asked if he has other plans due to his failed attempt to enter the White House complex, the defendant responded that he would do it again once he is out of custody (i.e., attempt to enter the White House complex again). SA Gallop and Officer Reyes-Arroyo explained to the defendant the risks that he takes by making such irrational decisions. In response, the defendant stated that this is a cause worth dying for. The defendant also stated that he is a big supporter of the President and his policies.

Following the defendant's arrest, the USSS conducted corroborative interviews with the defendant's father and brother. It appears that both individuals was unaware that the defendant was AWOL from the Army, as the father believed the defendant had arrived from Georgia to visit the family, and the brother indicated that when he spoke with the defendant on the Friday before the incident (i.e., January 10), the defendant indicated he would visit the family and then return to Georgia to his Army unit. The defendant did not mention the trip to India he had planned for on January 12.

Additionally, the brother advised that the defendant when he had spoken with the defendant over the past few months, the defendant had indicated he had been depressed for the past 5-6 months and that his life lacked meaning and wanted it to mean more. Prior to the defendant's admission about being depressed, the brother could not recall another instance where the defendant appeared to be struggling with mental illness. The brother also advised that the defendant had intended to go AWOL and move to Belarus to fight against human trafficking. The defendant had not, however, made any plans with any anti-human trafficking organizations; rather, he intended to just go there and figure it out.

Both the father and the brother were unaware of any diagnoses of mental illness or whether the defendant was taking any medication. Other than the defendant's admission, neither the father nor the brother had witnessed any signs of depression. However, the brother did note that when he spoke to the defendant in custody after his arrest, the defendant "didn't seem quite like himself," and "it's like he wasn't all there," referencing the defendant's mental state.

## ARGUMENT

As the defendant's competency is currently in question, the Court should defer ruling on the government's request for detention until after a competency evaluation, a competency hearing,

and any necessary period of competency treatment.[1]  "[I]f there is reasonable cause to believe that a defendant has a mental disease rendering hi/m unable to understand the nature and consequences of the proceedings and against him and/or to assist in his defense, it makes sense that the preliminary hearing and detention hearing be deferred until such time as the defendant has been determined to be mentally competent." *United States v. Moser*, 541 F. Supp. 2d 1235, 1237 (W.D. Okla. 2008).  *But see*, "[T]he need for scrutinizing a defendant's understanding of the proceedings at initial phases appears to be somewhat lesser than during trial." *United States v. Crawford*, 738 F. Supp. 564, 565 (D.D.C. 1990).  Where there are concerns about a defendant's competency to understand the proceedings, it is also difficult to assess in any meaningful way the defendant's risk of flight.

The Bail Reform Act lists four factors that guide a court's detention decision: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. §3142(g).  In considering the defendant's history and characteristics, the Bail Reform Act specifically instructs courts to consider a defendant's "mental condition." *Id.* at § 3142(g)(3)(A).  The D.C. Circuit has also recognized that a court may take into account a defendant's mental health when deciding whether the defendant should be detained pending trial or released on conditions.  *See United States v. Weissberger*, 951 F.2d 392, 399 (D.C. Cir. 1991).

---

[1] At the initial appearance on January 13, 2020, the Government requested a competency hearing pursuant to 18 U.S.C. § 4241(a) and a competency screening pursuant to 18 U.S.C. §§ 4241(b).  The Court ordered a twenty-four evaluation, which is currently scheduled for January 17, 2020.  Dr. Grant has advised that she should have the screening report no later than Tuesday, January 21, 2020.

At a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996). A judicial determination that a defendant should be detained pending trial as a serious risk of flight need only be supported by a preponderance of the evidence. *United States v. Vortis*, 785 F.2d 327, 328 (D.C. Cir. 1986).

If the Court is inclined to rule on detention at the hearing on January 16, 2020, the Court should find that, by a preponderance of the evidence, no condition or combination of conditions would reasonably assure the defendant's appearance at this time.

## Factual Proffer

The defendant is charged with entering and remaining in, and attempting to enter and remain in, a restricted area, that is, the secured area around the White House. The Government's evidence that he did so is strong. Defendant was witnessed by USSS law enforcement officer assigned to a foot patrol on Pennsylvania Avenue in front of the White House.[2] Furthermore, as he was stopped in the restricted area, the defendant explained to USSS personnel that he wanted to talk to the President. Shortly thereafter when asked why he jumped the fence, the defendant stated that he had time sensitive information to deliver to the President of the United States. Upon further questioning later by SA Gallop and Officer Reyes-Arroyo, the defendant elaborated that he needed to speak with the President about the "true answer to the universe" and a time-sensitive subject of human trafficking. Further evidencing his inability and/or unwillingness to follow the rules, the defendant indicated that the proper channels were too slow and nothing was being done.

As related to his history and characteristics, the defendant is a Second Lieutenant in the U.S. Army, and at the time of the incident was absent without leave (AWOL) from his assigned

---

[2] Given the surveillance set-up of the White House and its surrounding areas, there is also likely video of the incident; however, at the time of the filing of this Memorandum, the undersigned SAUSA has not yet been affirmatively advised that the incident was caught on any of the cameras.

post at Fort Benning in Georgia. Having already essentially fled and failed to return to his post at Fort Benning as required, the defendant's AWOL status would suggest that he is not inclined to follow instructions or Court orders to return to Court if released. Additionally, the defendant has no apparent ties to the District of Columbia, traveling here in a taxi, solely to seek out the President.[3]

Most importantly though, the defendant's mental health renders him unreliable and unlikely to adhere to court orders. His recent behaviors, as admitted to the USSS protective intelligence agents, demonstrate that the defendant is acting irrationally and illogically. Already AWOL, the defendant went to New York to visit family, but then attempted to go to India to supposedly save children from being trafficked. When that plan was thwarted for some reason the defendant was unable or unwilling to identify, he then heads straight for Washington, D.C. and jumps the bike racks so he can speak to the President. As to his mental state, the defendant's own brother indicated to USSS personnel that the defendant did not sound like himself and that it was "like he [the defendant] wasn't all there." Taken altogether, these facts suggest a defendant who is not himself, but suffering a mental health crisis and acting illogically and out of character.

As to the risk the defendant's release would pose to the safety of others or the community,[4] while he has not to the Government's knowledge ever been violent, the defendant has already indicated that he would attempt to enter the White House again. In doing so, the defendant is admitting to intending to create a situation where a potentially violent confrontation may occur.

---

[3] While the defendant himself has no ties to Washington, D.C., his brother apparently lives in Washington, D.C. The brother, however advised USSS personnel that he was leaving on an international vacation on January 14, 2020. The Government is unaware of when the brother plans on returning.

[4] As noted during the Initial Appearance, the U.S. Army has issued a detained for the defendant, requesting that any agency who currently has custody of defendant continue to detain him until the U.S. Army may take him into custody. Such a detainer, however, does not require such a courtesy. More importantly though, whether another agency or entity may thereafter take the defendant into custody if released should have no bearing on the Court's detention decision.

The Government also notes that the results of the screening evaluation ordered by the Court may provide additional information about the defendant's mental health and any risk he may pose if released, and the Court should therefore wait for the screening results before making its detention decision.

## Conclusion

For the foregoing reasons, the government requests that the Court order that the defendant be detained pending trial as a serious risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A).

        Respectfully submitted,

        JESSIE K. LIU
        United States Attorney
        D.C. Bar No. 472845


By:    /s/
        REAGAN N. CLYNE
        Special Assistant United States Attorney
        Virginia Bar No. 74767
        United States Attorney's Office
        National Security Section
        555 Fourth Street, N.W.
        Washington, DC  20530
        Reagan.Clyne@usdoj.gov
        (202) 252-7215